Filed 12/8/21  P. v. Hola CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087459 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F07862) |
| v. | |
| CHARLIE HOLA, | |
| Defendant and Appellant. | |

This is another case involving a gang war murder, this time between the Tongan Crips and Norteños.  A jury found defendant Charlie Hola guilty of second degree murder.  It also found him guilty of multiple offenses involving a crime spree that preceded the murder.  Defendant was sentenced to an aggregate term of 48 years to life.

On appeal, defendant contends (1) insufficient evidence supports the murder conviction based on indirect aiding and abetting under the natural and probable

1

consequences doctrine; (2) following the amendment to Penal Code section 188[1] in Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 1) (S.B. 1437), the murder conviction cannot be based on indirect aiding and abetting; (3) his trial counsel rendered ineffective assistance in failing to object to speculative gang testimony; (4) insufficient evidence supports a finding that he acted for the benefit of a criminal gang; (5) the jury should have been instructed that defendant cannot be convicted under the natural and probable consequences doctrine if he reasonably believed his codefendant would act in his defense; (6) that same instruction should also have been given when instructing on mutual combat and self-defense; and (7) certain conduct credits the trial court took away from defendant for misconduct in the jail must be restored.

We will modify the judgment to strike 24 days conduct credits erroneously awarded. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Crime Spree Before the Murder

Defendant's contentions arise from a murder capping a three-hour crime spree. The crime spree began when defendant and his codefendant, Tevita Kaihea,[2] stole a van and drove it to a fast food restaurant, where they robbed two people at gunpoint.[3]

About a half-hour later, they drove by the home of T.L. who, seeing the van, became suspicious that the van's occupants had been involved in a robbery the previous day where some of T.L.'s marijuana had been taken. T.L. got his gun and drove after the van. When it came to a stop, he started photographing the van. The codefendant stepped

---

[1] Undesignated statutory references are to the Penal Code.

[2] Kaihea is not party to this appeal.

[3] Only the codefendant displayed a gun during the robbery.

2

out of the passenger's side of the van and shot his gun six or seven times.[4]  The first shot

hit T.L. in the face.  He survived, though a bullet remains in his head.

### The Gang Altercation and Murder

About an hour later, defendant and codefendant arrived at Sacramento City

College where surveillance cameras would capture the murder.  In the surveillance video,

which was played for the jury, R.G. and R.R. can be seen walking down the street.  Both

were Norteño gang members.

R.G. and R.R. crossed paths with defendant and the codefendant, before

exchanging looks and squaring off.  A witness who skateboarded by described the four as

"arguing" or having a "disagreement."  The skateboarder couldn't hear what was said as

he had headphones on.  But the skateboarder noticed defendant looked particularly angry,

and R.G. looked "kind of confused"

R.G. then dropped his backpack as defendant charged forward, delivering multiple

blows, primarily to R.G. but also to R.R. who hovered close by.  The fight began less

than a minute after passing each other.

During the melee, R.R. stabbed defendant four times, including in the chest.  In

the video, R.R. can be seen, as one witness described, "making movements toward"

defendant, "you can't see the knife, . . . but you can presume that's when the stabbing had

occurred because he's moving in close, close enough to [defendant] . . . ."

As defendant fought the Norteños, the codefendant approached, while appearing to

draw a gun and rack its slide.  He then pointed the gun and ran forward shooting.  A

witness described the codefendant as "continuously, actively shooting the victim, who

was [lying] on the ground."  R.G. collapsed while  R.R. ran off.  The codefendant and

---

[4]  Someone opened the passenger side door to T.L's truck, and after the shooting, the gun
T.L. had was missing.

defendant then walked away. A man working nearby heard "the first guy" say something to the effect of "you didn't see nothing."

Police found defendant on a park bench a block and half away, bleeding. R.R. sustained a bullet graze wound on his left hip. R.G. died from multiple gunshot wounds. The bullet trajectory for each wound was from the back of his body to the front. After the shooting, the skateboarder noticed that R.G. was wearing a red belt. The skateboarder thought the belt was gang related. Red is a Norteño color.

### Gun Evidence

Nine-millimeter shell casings found at the murder scene were fired from the same gun used to shoot T.L.

Police later found a gun in defendant's bedroom, but it was excluded as having been involved in either shooting.

### Gang Evidence

A prosecution gang expert explained that from 2014 to 2016, a gang war ensued between the Tongan Crips and the Norteños. The feud began in mid-2013, when the codefendant's brother was killed. The expert also opined that both defendant and the codefendant were Tongan Crips.

The expert testified that two years before the shooting, in early 2013, defendant was stopped in a vehicle with three validated Tongan Crips. A black ski mask was found in the car. The same year, he was in the presence of Tongan Crip members involved in a neighborhood shootout. The jury was also shown photos of clothes taken from defendant's bedroom shortly after the murder, which were described as "[a] lot of blue" and no red, and which the expert explained was consistent with Crip affiliation.

As to the codefendant, in 2014, Tongan Crip graffiti was found in his bedroom, and he told an officer he "does mess with the Tongan Crips." He was also validated as a Tongan Crip that year. After his arrest on this case, he was seen making a Crip sign in

4

jail and came to court wearing shoes marked with gang graffiti. He has "TC" tattooed under his eye.

The expert explained that gang members take pride in their affiliation and show it by displaying colors. He also explained that in gang culture, respect is equated to fear and dominance. Within a gang, respect is earned by showing allegiance and a willingness to do things for the gang. Respect is lost by showing cowardice or unwillingness to stand up for the gang or do its work.

According to the expert, if rival gang members came across each other in a public setting, and exchanged words, neither side could back down nor walk away without losing respect. If it escalated into a fight, both sides would be compelled to fight to maintain respect. And if one gang member is fighting, those around him would be expected to join and escalate. To do otherwise would show fear and weakness.

Further, when a gang member commits a crime involving a physical altercation, it helps establish the gang's dominance in the area — the public will be reluctant to report gang activity if it knows a gang is willing to use violence.

### Closing Arguments

At closing, the prosecutor argued that defendant could be convicted of second degree murder based on a theory of indirect aiding and abetting, because he committed or aided and abetted an assault, and the murder was a natural and probable consequence of the assault. The prosecutor expressly disclaimed the theory of direct aiding and abetting an intentional murder: "I don't think you're going to get there on [defendant] because you would have to assume [defendant] intended to kill [the victim] before [the codefendant] shoots." The prosecutor did not argue direct aiding and abetting implied malice murder.

The defense argued the murder was not a natural and probable consequence of a fistfight, and the shooting was precipitated by the stabbing.

5

**Verdicts and Sentencing**

The jury found defendant not guilty of first degree murder, but guilty of second degree murder (§ 187, subd. (a)) for R.G.'s death, and found the crime was committed for the benefit, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)), as well as that defendant was a principal in an offense in which a principal personally discharged a firearm causing death (§ 12022.53, subd. (d)). It also found him guilty of two second degree robbery counts (§ 211) with firearm enhancements (§ 12022.53, subd. (b)), possessing a firearm as a felon (§ 29800, subd. (a)), and taking or driving a vehicle (§ 10851, subd. (a)).

The jury acquitted defendant of attempted murder of T.L. However, the codefendant was found guilty of attempted murder for that shooting.

The trial court imposed an aggregate 40-year-to-life indeterminate term along with an eight-year determinate term. The indeterminate term was calculated as follows: 15-years-to-life for murder, along with a 25-year-to-life term for the firearm enhancement. The aggregate determinate term was calculated as follows: the upper term of five years on count three, robbery, plus one year for the arming allegation; one year consecutive on count four, robbery, plus four months for the arming allegation (one-third the midterm on the charge and enhancement); eight months on count six, felon in possession of a firearm (one-third the midterm). Defendant was also sentenced to 364 days consecutive for the taking or driving a vehicle charge, which was satisfied with custody credits.

## DISCUSSION

### I. Substantial Evidence of Indirect Aiding and Abetting

#### A. Defendant's Contentions

Defendant contends insufficient evidence supports his conviction for murder under an aiding and abetting theory. He argues the evidence does not support a finding of direct aiding and abetting an intentional murder, as was conceded by the prosecutor. And as to indirect aiding and abetting, the record cannot show the shooting was a natural and

6

probable consequence of starting a fistfight.  He contends that while a verbal challenge of some sort occurred, nothing indicates it had to do with gang affiliation.  And neither he nor his codefendant wore gang colors.

The People respond that sufficient evidence supports a finding of indirect aiding and abetting.  The People also postulate that the murder conviction can also be sustained under a theory of direct aiding and abetting implied malice murder.  We agree that sufficient evidence establishes indirect aiding and abetting and do not reach the separate theory of direct aiding and abetting implied malice murder.

## B.  Standard of Review

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  . . .  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)  In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

## C.  Natural and Probable Consequences

Under the law in effect at the time R.G. was killed, an aider and abettor could be convicted for second degree murder committed by the direct perpetrator under two

7

alternative theories: (1) a defendant with the necessary mental state could be liable under direct aiding and abetting principles, or (2) a defendant could be liable not only for an intended crime, but also for any offense that was the natural and probable consequences of the crime aided and abetted, i.e., indirect aiding and abetting. (*People v. Chiu* (2014) 59 Cal.4th 155, 158; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.)

Thus, under "the natural and probable consequences doctrine, a person who aided and abetted only an intended assault could be found guilty of second degree murder, even if unintended, if the murder was a natural and probable consequence of the intended assault. [Citation.] Whether the nontarget crime was a natural and probable consequence was to be determined from the perspective of a reasonable person. [Citations.] 'The inquiry [did] not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability " '[was] measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 711 (*Powell*).) Whether a consequence is reasonably foreseeable "is to be evaluated under all the factual circumstances of the individual case." (*People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Prettyman* (1996) 14 Cal.4th 248, 261). The test is " 'whether, *under all of the circumstances presented*, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901 (*Covarrubias*).) (Italics added.)

Here, substantial evidence supports a finding that the shooting was a natural and probable consequence of defendant assaulting the Norteños. There was an ongoing war between Tongan Crips and Norteños. Defendant and the codefendant were Tongan Crips. R.G. and R.R. were Norteños. R.G. was wearing a red belt. As the gang expert explained, gang members commonly escalate fistfights to the point of lethal force and

8

expect opponents to be armed. And fellow gang members are expected to join in the fight; otherwise they will be considered weak.

Defendant appeared "particularly angry," and initiated the physical altercation by charging at R.G. And he did so less than a minute of passing the Norteños. When defendant charged at R.G., he knew from the preceding three hour crime spree, that his codefendant had a gun and a propensity to use it, as he demonstrated when he shot T.L.

Given these circumstances, we conclude there was substantial evidence to support a finding that a reasonable person in the defendant's position would have or should have known that murder was a reasonably foreseeable consequence of the assault he initiated against rival gang members. Thus, the murder was a natural and probable consequence of the assault. Indeed, this is certainly not a case where " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " this theory of liability.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

### D. Implied Malice

The People separately contend that defendant's murder conviction can also be sustained under a theory of implied malice murder, even though the prosecutor did not argue implied malice to the jury. While aiding and abetting implied malice murder is a valid legal theory applicable in some circumstances (see *Powell*, *supra*, 63 Cal.App.5th at pp. 711-714), we need not address this theory here, as we have concluded there is substantial evidence of defendant's liability for second degree murder as an indirect aider and abettor based on the natural and probable consequences doctrine.[5]

---

[5] At oral argument, defendant asserted that an amendment to section 1170.95, enacted in Senate Bill No. 775 (2021-2022 Reg. Sess., effective January 1, 2022), should apply to him. Senate Bill No. 775 amends subdivision (g) of section 1170.95 to provide: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." (Capitalization omitted.) The amendment is silent on what remedy a defendant

9

## II. Senate Bill No. 1437

Next defendant contends his conviction under an indirect aiding and abetting theory must be reversed in light of amendments to section 188 in S.B. 1437. We disagree.

While this appeal was pending, our high court settled the split between various districts of the Court of Appeal on this issue that had existed when this appeal was filed. In *People v. Gentile* (2020) 10 Cal.5th 830, the court held that the changes resulting from the enactment of S.B. 1437 do not apply retroactively to defendants who have pending appeals. (*Gentile*, at p. 839.) Rather, S.B. 1437 established an exclusive mechanism for retroactive relief set forth in section 1170.95. (*Ibid*.) Accordingly, to obtain S.B. 1437 relief, defendant must file a petition under section 1170.95. (*Ibid*.)

---

who successfully challenges the validity of his conviction on appeal is entitled to. It is not clear whether we must simply find the evidence insufficient and vacate the murder conviction or whether we must find the evidence insufficient and remand the matter to the trial court to allow the People to produce additional evidence, as they are entitled to do under 1170.95, subdivision (d)(3). Subdivision (d)(3) allows both parties to produce additional evidence and gives the prosecution an opportunity to establish a valid theory of murder, such as direct aiding and abetting implied or express malice murder. Subdivision (d)(3) recognizes that the prosecution may have opted to proceed on a natural and probable consequences theory as the easiest theory to advance to the jury at trial. It impliedly recognizes that other evidence may have been available during trial or could have surfaced or been developed after trial that could establish murder on an alternative theory. While the Legislature amended both subdivisions (d)(3) and (g), it did not state that vacation of the conviction on appeal without a subdivision (d)(3) hearing is the appropriate remedy. Appellate counsel suggested he might file a request for supplemental briefing, in which case we will consider his request. If granted, a schedule for supplemental briefing will be established and the matter submitted when the last brief is filed. We will then have 90 days to decide whether the appropriate remedy is to vacate the judgment without allowing a subdivision (d)(3) hearing, or remand for a subdivision (d)(3) hearing or to order some other remedy. Or if defendant decides not to file supplemental briefing, he will be free to petition the trial court under section 1170.95 as soon as a remittitur is issued in this appeal.

10

### III.  The Failure to Object to Certain Gang Testimony

### A.  Defendant's Contentions

Defendant contends his trial counsel rendered ineffective assistance in failing to object to the gang expert's opinion testimony that the shooting was gang-related "on both sides."  He argues this was an impermissible opinion regarding defendant's specific intent when committing a crime.  We disagree.

### B.  Additional Background

Defendant's contention focuses on an isolated portion of testimony italicized below.  We recount that portion as well as the necessary context.

During direct examination of the gang expert, the prosecutor asked a series of hypothetical questions mirroring the facts of this case.

"[Prosecutor]:  I'm going to give you a little bit of a hypothetical situation.  [¶]  If members of gangs that were actively rivals were to come across each other in a public setting, no matter what the public setting is, and were to exchange words of some sort, would either side of that verbal altercation be able to back down or walk away without losing respect?

"[Gang Expert]:  No . . . you would definitely lose face.  You would lose respect amongst your peers or your fellow gang members if you're not willing to stand up and, I guess, defend the honor of your gang, per se.

"[Prosecutor]:  And what if those verbal words, the altercation, escalated into a fight?  Would both sides be compelled to fight in order to maintain respect?

"[Gang Expert]:  Yes, generally, absolutely.

"[Prosecutor]:  So more specifically, if you had two guys on each side and one guy from side A charges in to fight one guy from side B, would the other guys that were there be compelled to fight, or would it be a standard one-on-one fight typically?

"[Gang Expert]:  I would say typically, it's going to be a — there's going to be a natural progression involved in these altercations.  It's not common to have just two —

you know, with two groups or several subjects, to just fairly, you know, duke it out, throw blows, and then be all good and go about your way. [¶]   There will be an escalation, generally, and I think it would be — it's expected that those around there are going to join in and, you know, I guess help advance that escalation.

"[Prosecutor]:  Now, I'm going to push it a little bit further.  If the guy from side A who rushes in to fight the guy from side B — if the second guy from side B gets into that fight, what would the expected reaction of the second guy from side A be?

"[Gang Expert]:  To join in and to do whatever it takes to help his partner or to . . . basically come out victorious.  They need to win that fight, that altercation.

"[Prosecutor]:  And if the second guy from side A, if he never gets involved in the physical fight, is the other gang going to think that he's weak or afraid?

"[Gang Expert]:  I would say not only the other gang, but probably his own gang as well."

Later during the prosecution's direct examination, after the expert opined that defendant and the codefendant were Tongan Crip gang members, the following occurred:

"[Prosecutor]:  Okay.  Now, let's talk about this case.  Are you familiar with the facts of this case?

"[Gang Expert]:  Yes.

"[Prosecutor]:  And how did you familiarize yourself with this case?

"[Gang Expert]:  Mostly by discussing it with other detectives as well as reading the reports and just doing some of the research . . . .

"[Prosecutor]:  *And is it your opinion that the Sacramento City College portion of September 3, 2015, is a gang-related crime*?

"[Gang Expert]:  *I believe it is, yes*.

"[Prosecutor]:  *Would it be your opinion that it's a gang-related crime on both sides, meaning [R.R.'s] prosecution for assault with a firearm [sic], as well as the shooting and homicide of [R.G.]*?

12

"[Gang Expert]:  *Yes*

"[Prosecutor]:  Why?

"[Gang Expert]:  Well, you have two separate groups, you know, two people in each both being gang members, as well as an ongoing feud that has been going on for a couple years, and then just by the actions of both groups would be consistent with what happens when two rival gangs encounter each other.

"[Prosecutor]:  And how would this kind of a situation itself specifically benefit either or both gangs:  Two guys on each side coming across each other on a college campus, brief exchange of words, a fight escalates to a stabbing and a shooting.  How does that benefit either or both gangs?

"[Gang Expert]:  It would definitely — you don't want to be the loser in that sense.   That would show the weakness.  By being the one who showed dominance, who showed the willingness to commit the violence, you're establishing that sense of respect that we discussed earlier, where other gangs are going to fear you, respect you.  It gives you a better standing out and about in your area.

"[Prosecutor]:  If you lose a simple fist fight, in gang culture, are you a punk?  Do you lose respect?

"[Gang Expert]:  Yes.

"[Prosecutor]:  And if you get stabbed, in gang culture, and you don't respond, are you a punk?  Do you lose respect?

"[Gang Expert]:  Yeah.  You're going to look weak.

"[Prosecutor]:  If you get stabbed but end up shooting and killing somebody, who's the loser of that event, in gang culture?

"[Gang Expert]:  The loser in that in gang culture is going to be the one . . .  who got shot or killed."

Defense counsel did not object to any part of this testimony, including the italicized portion, which defendant challenges on appeal.  According to defendant, his

13

counsel rendered ineffective assistance in failing to do so. He argues the expert was not testifying to a hypothetical but to the intentions of the defendants. We conclude defendant has failed to establish ineffective assistance of counsel.

## C. Analysis

To prevail on a claim premised on the ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-694 [80 L.Ed.2d 674, 693, 696-698] (*Strickland)*; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland's* high bar is never . . . easy.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 632], quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 357 [176 L.Ed.2d 284, 297].) *Strickland's* bar is high because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.]' " (*Richter*, *supra*, 562 U.S. at p. 105.)

The first prong, concerning deficient performance, involves two issues in the context of this case: (1) Whether the testimony was objectionable and (2) if it was objectionable, was the decision not to object tactical.

Citing *People v. Vang* (2011) 52 Cal.4th 1038, 1044, defendant argues that gang experts are prohibited from opining on a defendant's specific intent.[6] But that is not what

---

[6] Defendant also cites *People v. Killebrew* (2002) 103 Cal.App.4th 644, disapproved in *Vang*, *supra*, 52 Cal.4th at p. 1047, fn. 3. Regarding *Killebrew* and its prohibition against gang expert testimony as to a defendant's specific intent, the *Vang* court stated: "To the extent that *Killebrew* [citation] was correct in prohibiting expert testimony regarding whether the specific defendants acted for a gang reason, the reason for this rule is *not* that

14

happened here; the expert did not opine as to anyone's specific intent. He opined that the crime was gang related, something the *Vang* court recognized gang experts are allowed to do. (*Vang*, at p. 1045, discussing *People v. Gardeley* (1996) 14 Cal.4th 605, 619.)

Still, such opinions are usually preceded by a hypothetical question mirroring the evidence in the case, as approved in *Vang*. (*Vang*, *supra*, 52 Cal.4th at pp. 1045-1046; see also *People v. Perez* (2017) 18 Cal.App.5th 598, 607 ["[w]hile a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent"].) In discussing such hypothetical questions, the *Vang* court emphasized that " 'the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors," ' " but rather "must be rooted in the evidence of the case being tried." (*Vang,* at p. 1046.)

Along those lines, defendant argues, in his reply brief, that the gang expert's opinion here was not solicited as a hypothetical question. He acknowledges the gang

such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' " (*Vang*, *supra*, 52 Cal.4th at p. 1047.) But the *Vang* court also noted: "*It appears that in some circumstances, expert testimony regarding the specific defendants might be proper*. [Citations.] The question is not before us. Because the expert here did not testify directly about the defendants, but only responded to hypothetical questions, we will assume for present purposes the expert could not properly have testified about the defendants themselves." (Italics added.) (*Vang*, at p. 1048, fn. 4.)

expert "could have offered an opinion based on a hypothetical," citing *Vang*; but maintains "any hypothetical based on the evidence would not have supported the detective's conclusion."

But as noted, *Vang* authorizes opinions that a crime is gang related. (*Vang*, *supra*, 52 Cal.4th at p. 1045.) Regarding the gang expert, the *Vang* court wrote: "[H]e could not testify directly whether [the defendants] committed the assault for gang purposes. But he properly could, and did, express an opinion, based on hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Id*. at p. 1048.)

Here, the expert did not directly testify that defendant committed the murder for a gang purpose. More importantly, the answer the expert gave clearly established his opinion was grounded on evidence the jury had heard, which is the point of soliciting the opinion by a hypothetical question. And that evidence was sufficient to support his opinion. When asked why he was of the opinion the crimes committed at the college were gang related, the detective replied: "Well, you have two separate groups, you know, two people in each both being gang members, as well as an ongoing feud that has been going on for a couple years, and then just by the actions of both groups would be consistent with what happens when two rival gangs encounter each other."

Those facts could have been posed in the form of a hypothetical, and then the expert would have been permitted to opine that the crime was gang related based on those hypothetical facts. But, in our view, an expert explaining his reason by referencing specific facts in the case is consistent with *Vang's* direction that an expert's opinion be grounded on evidence the jury heard and not "on speculative or conjectural factors." (*Vang*, *supra*, 52 Cal.4th at p. 1046.) Moreover, as the totality of the questions and answers we have cited demonstrates, the prosecutor had asked hypothetical questions mirroring the facts of the case earlier in the direct examination. We see no reason why the prosecutor would need to repeat the same hypothetical questions before soliciting an

16

opinion as to whether the crime was gang related, especially when the reason the expert gives for the opinion is rooted in the evidence of the case. Trial counsel could have been thinking the same thing, and so, no objection was made.

That brings us to the second question in determining whether trial counsel's performance was deficient: Was there a tactical reason for not objecting? As our high court has noted: "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) *there simply could be no satisfactory explanation*." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics added and omitted.)

Here, a satisfactory explanation exists for not objecting. The opinion as to whether the murder was gang related was admissible, so it was coming in anyway. Making the prosecutor ask another hypothetical question would have served only to reemphasize the evidence establishing the opinion's validity. It is understandable why defense counsel did not object.

The same holds true with the prejudice prong: any objection based on the lack of a hypothetical question, if sustained, would not have prohibited the opinion if asked pursuant to a proper hypothetical question. Thus, assuming another hypothetical question was required, the opinion would still have come in once posed. Defendant therefore could not have suffered prejudice from the failure to object, and the claim of ineffective assistance is accordingly meritless. (*Strickland*, *supra*, 466 U.S. at pp. 693-694 [To establish prejudice, a defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient]; *Ledesma*, *supra*, 43 Cal.3d 171, at pp. 217-218.)

17

## IV. Sufficiency of Evidence and the Gang Enhancement

### A. Defendant's Contentions

Defendant next contends insufficient evidence supports the finding that he acted to benefit, or in association with, a criminal gang. He argues there was a lack of evidence that he was a gang member and none of the crimes preceding the murder indicated gang motivation or carried gang enhancements. Further, according to defendant, the expert opinion that the shooting was gang motivated was based on speculation as to what was said between defendant and the Norteños just before the physical altercation. He also notes that neither he nor the codefendant wore gang colors, and neither group knew each other. He suggests that the evidence is such that he simply reacted to an insult or challenge, unrelated to a gang. We conclude substantial evidence supports the gang enhancement finding.

### B. Standard of Review

Again, when the sufficiency of the evidence is challenged on appeal, we look at the record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*Jennings*, *supra*, 50 Cal.4th at pp. 638-639.) Reversal is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid*.)

### C. Analysis

To establish a gang enhancement under section 186.22, subdivision (b)(1), the defendant need not be an active or current gang member. (*People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 539.) "Gang membership is simply circumstantial evidence" that the crime was gang related and shows a motive for harboring intent " 'to promote, further, or assist in any criminal conduct by gang members.'" (*Id*. at p. 540.)

Here, again, a gang expert opined that defendant was a member of the Tongan Crips, as was his codefendant. Apart from the expert's opinion, the other evidence at the very least, established that defendant closely associated with the Tongan Crips and his

18

crimes were motivated by that association. He was twice found with Tongan Crips. His clothing was consistent with Crip affiliation. And before the murder, he spent three hours on a crime spree with a Tongan Crip. Together, this forms strong circumstantial evidence of Tongan Crip affiliation and concomitantly intent to benefit a gang and its members by vindicating the gang's reputation and attacking the gang's enemies, the Norteños. Clearly, defendant's conduct and that of the codefendant was consistent with a confrontation between warring gangs. And though defendant asserts neither group knew each other, the gang expert testimony suggests lack of personal familiarity does not stop gang members from assaulting one another. Indeed, the fact that the groups came to blows in less than a minute of passing each other strongly suggests the most logical explanation for the confrontation was gang motivation.

Accordingly, a jury could reasonably conclude defendant acted to benefit, or in association with, a criminal street gang. Again, this is certainly not a case where " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the gang enhancement finding.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.) The contention therefore lacks merit.

### V. Self-Defense Instructions

### A. Defendant's Contentions

Defendant next contends the trial court erred in failing to instruct that defendant could not be convicted of murder if he reasonably believed his codefendant would — as a natural and probable consequence of defendant being stabbed — act in defense of another. We disagree.

### B. Additional Background

The jury was instructed that to find defendant guilty of murder as an indirect aider and abettor, it must find: "One, the crime of assault was committed; Two, the defendant Charlie Hola committed or aided and abetted that crime; Three, that a co-principal in that

19

crime committed the crime of murder; And, four, the crime of murder was a natural and probable consequence of the commission of the crime of assault."

The instruction went on: "In determining whether a consequence is natural and probable, you must apply *an objective test, based not [on] only what the defendant actually intended, but what a person of reasonable and ordinary prudence would have expected likely to occur*. The issue is to be decided in light of all of the circumstances surrounding the incident. A natural consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. Probable means likely to happen." (Italics added.)

The jury was also instructed as to self-defense, using CALCRIM No. 505 that "A defendant is not guilty of murder . . . if he was justified in killing someone in self-defense or defense of another."

## C. Analysis

On appeal, defendant argues the self-defense instruction should have been modified to include the following: "As an indirect aider and abettor, defendant Hola's liability for murder in Count One is dependent not on shared intent to kill but on whether the crime of murder was a natural and probable consequence of the crime of assault . . . . In order to reach a conclusion on that question, you must determine whether defendant Hola reasonably believed that [the codefendant] fired his gun in response to the stabbing of Hola by [R.R.], . . . then Hola had a right to self-defense and cannot be convicted under the natural and probable consequence doctrine."

He argues without that instruction, the jury had no path to acquit him via self-defense, despite being stabbed. And it was improper to instruct that his right to self-defense depended on the codefendant's right to defend others, where he and his codefendant had different perspectives as to whether a stabbing had occurred.

The People respond that defendant's contentions are forfeited for failure to request the modified instruction at trial. The People are correct. "[A] defendant may raise for the

20

first time on appeal instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; Accord, *People v. Hardy* (2018) 5 Cal.5th 56, 91; See also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [aiding and abetting instruction].) " '[B]ecause the instruction given was correct, it was incumbent on defendants to request clarifying language. Their failure to do so waived the issue.' " (*Covarrubias, supra,* 1 Cal.5th at p. 877, quoting *People v. Hardy* (1992) 2 Cal.4th 86, 153; Accord, *Samaniego*, at p 1163.)

Defendant, nevertheless, maintains the contention is preserved because it affected his substantial rights, or alternatively his trial counsel rendered ineffective assistance in failing to request it. We find neither to be the case because defendant's proposed modification is contrary to the law.

Defendant's proposed instruction transforms the doctrine of indirect aiding and abetting from an objective test to a subjective test. Under defendant's proposal, even if the murder was a natural and probable consequence of defendant's assault on the Norteños, defendant would be absolved if at some point in the assault he subjectively believed his codefendant would be justified in using deadly force. That is not the law.

As the proposed modified instruction runs contrary to the law at the time of trial, trial counsel had no obligation to request it, and its absence did not affect defendant's substantial rights.[7]

---

[7] We also note that the theory that defendant could not be convicted based on a natural and probable consequences doctrine, if he reasonably believed the codefendant would act in defense of another as a natural and probable consequence of R.R. stabbing him, was not advanced as a defense at trial. Defendant's defense was that the shooting was not a natural and probable consequence of the fist fight. We further note that the codefendant did not shoot at the person who stabbed defendant. Instead, he fired multiple shots at

## VI. Mutual Combat Instructions

Defendant raises an identical instructional challenge as to the instruction on self-defense and mutual combat. The contention is forfeited for failure to request the instruction, and were it preserved no instruction error could be found.

The jury was instructed that one engaged in mutual combat can claim self-defense only if he tries in good faith to stop fighting, indicates his desire to do so, and gives his opponent a chance to stop fighting. But if one uses only nondeadly force and his opponent uses sudden deadly force, one can (if he cannot withdraw), use deadly force, and need not communicate that desire to cease fighting.

Defendant maintains that as to that instruction on mutual combat and self-defense, the jury should also have received the proposed modified instruction discussed *ante* ("you must determine whether defendant Hola reasonably believed that [the codefendant] fired his gun in response to the stabbing of Hola . . . ."). He reasons that he engaged in mutual combat, and without the modified instruction his trial counsel was constrained to argue that the codefendant must have been aware of the stabbing, or at least the prosecution bore the burden of proving he was not. He argues his right to claim self-defense should not depend on whether his codefendant had a right to self-defense. Defendant is mistaken.

Indirect aiding and abetting liability *is* derivative. (*Prettyman, supra,* 14 Cal.4th at p. 259.) Under the law at the time of trial, if the codefendant committed murder, and that murder was the natural and probable consequence of defendant aiding and abetting an assault, defendant is liable for the murder. Defendant cannot escape liability because he mistakenly believed his codefendant was acting in defense of other. Again, a defendant's

R.G., so the claim of defense of others was tenuous at best and appropriately rejected by the jury.

22

intent is solely directed as to his act of assault, which took place before he was stabbed any shots were fired. (*Id*. at p. 261.)

## VII. Conduct Credits

In his final contention, defendant argues the trial court erred in subtracting 96 days of conduct credits for jail violations, leaving him with only 24 days conduct credit. He also argues he should have received an additional 182 days of conduct credit attributable to his misdemeanor conviction.

The People take issue with defendant's calculation and also point out that by virtue of his murder conviction, defendant is ineligible for any conduct credit. The People are correct.[8] (See § 2933.2, subd. (a) ["any person who is convicted of murder, as

---

[8] In his reply, defendant argues that denying conduct credits as to his non-murder counts denies him equal protection, and concomitantly his murder conviction should not single him out for harsher treatment. In support he cites *People v. Sage* (1980) 26 Cal.3d 498. *Sage*, however, considered a statutory disparity in which misdemeanants received presentence conduct credits while felons did not. (*Id*. at p. 507.) The court found no "rational basis for, much less a compelling state interest in, denying presentence conduct credit to detainee/felons." (*Id*. at p. 508.) But defendant fails to offer analogous authority suggesting either that one convicted of murder is similarly situated to a felon not convicted of murder, or that no rational basis exits to deny conduct credits to those convicted of murder. Indeed, courts "find a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose." (*People v. Chatman* (2018) 4 Cal.5th 277, 288-289.) And as our high court has noted, "[a] classification in a statute is *presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable*." (*Id*. at p. 289, italics added.) Our high court has also noted, "[t]he underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers . . . . Nor does the logic behind a potential justification need to be persuasive or sensible— rather than simply rational." (*Ibid*.) And "equal protection does not require a perfect fit between a statute's means and the legitimate state ends those means can serve." (*Id*. at p. 290.) Assuming convicted murderers are similarly situated to people convicted of other offenses, the Legislature could have had a rational basis for denying conduct credit to convicted murderers. Certainly, defendant has shown nothing to the contrary. (See *People v. Duff* (2010) 50 Cal.4th 787, 797 ["section 2933.2 was intended to ensure that a person who 'is convicted' of the qualifying offense, namely murder, would not advance

defined in Section 187, shall not accrue any credit, as specified in Section 2933 or Section 2933.05"]; *People v. Wheeler* (2003) 105 Cal.App.4th 1423, 1432 ["section 2933.2 applies to the offender not to the offense and so limits a murderer's conduct credits irrespective of whether or not all his or her offenses were murder"].)

We will therefore modify the judgment to strike the 24 days conduct credits awarded.

## DISPOSITION

The judgment is modified to strike the 24 days conduct credits awarded. The trial court is directed to prepare an amended abstract of judgment reflecting that change and to forward it to the Department of Corrections and Rehabilitation. In all other respect the judgment is affirmed.

/s/
MURRAY, J.

We concur:

/s/
RAYE, P. J.

/s/
RENNER, J.

---

the time of his or her release by means of presentence conduct and postsentence worktime credits"].) We therefore reject the equal protection challenge.